785 P.2d 121

**In the Matter of the APPEAL IN PIMA COUNTY JUVENILE DEPENDENCY ACTION NO. 96290.**

**No. 2 CA–JV 89–0013.**

Court of Appeals of Arizona, Division 2, Department B.

Jan. 23, 1990.

Daniel J. Hochuli, Tucson, for Minors.

Robert K. Corbin, Atty. Gen. by Jay W. McEwen, Tucson, for Dept. of Economic Security.

Law Offices of Thomas E. Higgins, Jr. by Thomas E. Higgins, Jr., Tucson, for Parents.

## OPINION

PER CURIAM.

This appeal is taken from the order of the juvenile court adjudicating appellant's four minor children dependent. The pro-

ceedings were initiated in July of 1987, when appellant's two-month-old son "J" was taken to the hospital with first- and second-degree burns on his abdomen, leg, shoulder, elbow, foot and back. Medical evaluation also revealed that his left testicle was bruised and hemorrhaging, that he was suffering from a urinary tract infection and that he had failed to grow at a normal rate since birth. The mother gave inconsistent explanations to medical personnel and investigating officers of how the burns occurred in the middle of the preceding night. She first stated that the father was holding the baby on the couch in the living room when their three-year-old daughter "K" poured hot water on him, but later stated that K had placed the baby in the bathroom sink and turned on the hot water.

J and K were taken into temporary custody and a dependency petition was filed as to both children based on the foregoing facts. A second son, "M," nine months old, was also taken into temporary custody following the parents' arrest on child abuse charges. An amended dependency petition as to M alleged that the child's home was "both hazardous and unhealthy" and that the child was suffering from chronic bronchitis and an ear infection for which he had received no treatment. The petition further alleged that the child had not been immunized and that he required medical treatment for a limp.

A third son, "D," was born to the parents on March 17, 1988, and he too was taken into temporary custody shortly after birth. The petition filed as to him alleged, among other things,[1] that D was "in danger of suffering abuse due to his tender age and to the parents' history of the abuse and medical neglect of their other children."

All of the children remained in the custody of the Department of Economic Security (DES) during the pendency of these proceedings. Commencing in October of 1987,

---

1. The petition also alleged that the parents had pled guilty to a charge of felony child abuse. No evidence of this was presented at the severance hearings as to the mother. The father's testimony indicated that he had pled no contest to a charge of child abuse, but had moved to withdraw his plea.

K began therapy with Linda Conaway–Morgan, a psychiatric social worker. The initial assessment of the child by psychologists was that she was developmentally delayed and exhibited fear with respect to her parents. The therapy sessions included both conversations with the child and use of toys and art materials to encourage the child to express herself and to assist the therapist in identifying areas of conflict.

Conaway–Morgan testified that the sessions indicated that K was fearful of her father and was subject to harsh discipline from him. The child gave inconsistent reports as to who had caused the injuries to J, sometimes reporting that she had done it and other times stating that her father was responsible. It also became apparent that she had observed sexual relations between the parents and was unusually knowledgeable about sexual matters for a child of her age.

In April of 1988, the therapist received a report from Child Protective Services (CPS) that K may have been molested in the foster home. At a therapy session, she asked K "if anyone had touched her inappropriately in ways that felt uncomfortable." K replied that "Daddy" did, and proceeded to give more specific information. Dr. Conaway–Morgan testified:

> What she did is indicate that he kissed her pee-pee, her butt and put his pee-pee in her pee-pee and she said that it felt good, and asked if he said anything to her and she said yes. I said, what did he say? She said a nice word, sorry.
>
> And I asked her if anyone else knew about that and she said [her mother]. And I said, what did she say and she said, don't do that. I again asked, what did Daddy ... say and she said sorry and I asked her if it had occurred more than one time and she said more than one time.
>
> And I asked her if it was daytime or nighttime and she said nighttime. Where? My room. And she indicated that Daddy ... had his clothes off.

Shows herself on her stomach with the father on top of her.

\*     \*     \*     \*     \*     \*

> And I asked her, could you—and did [the mother] ask you not to tell anybody about that and she nodded yes. And I asked her if Daddy ... had told her not to tell anybody and she indicated yes. And I asked if she was told if she would get into trouble if she would and she indicated no.

The therapist further testified that K repeated this information consistently in subsequent sessions and also indicated the events through anatomically-correct pictures. The dependency petition as to K was amended in April to include an allegation of sexual abuse by the father.[2]

In addition to testimony concerning the foregoing facts, the juvenile court heard testimony from Dr. Alan Jones, the Pima County Medical Examiner, that the burns to J were nonaccidental and that they were not caused by K. Testimony was also presented concerning the inconsistent accounts of the events provided by the parents. Further, the investigating officers testified as to the dirty and unhealthy condition of M when he was taken into custody and the unhealthy condition of the home. The DES intake worker, Pat Jansen, testified that she observed cat feces, kitty litter, and food on the floors. There were used disposable diapers in the living room and master bedroom. Sharp objects and tools were within reach of the children. The house was generally dirty and smelled of cat urine and cigarettes. The record also reflects that the refrigerator was moldy and contained rancid food.

The parents also testified at the hearing. Appellant repeated her version of the events the night J was burned and denied any knowledge of sexual abuse of K. She also testified that she and her husband had attended parenting classes and participated in psychological evaluations required by CPS, and were willing to attend any other counselling required by CPS. The father

2. The amended petition also alleged sexual abuse by the paternal grandfather, based on statements to the therapist by K which the ther-apist later determined she had misunderstood. The petition was later amended to delete those allegations.

also testified consistently with his prior statements concerning the burns to J, and denied any sexual contact with K. Both admitted that the father was an alcoholic and had been convicted of driving while intoxicated during the pendency of these proceedings; however, the father testified that he was now sober and participating in an Alcoholics Anonymous program.

The juvenile court found the children to be dependent as alleged in the petitions, ruling in part as follows:

These children are dependent by every definition in the statute. Their home was filthy and inappropriate. Their parents neglected them, medically, emotionally, and physically. [J] suffered an extreme injury as a result of the father's intentional or reckless abuse. [K] was blamed for the injury to [J] in a story by the parents that is neither plausible nor medically reasonable. She was sexually abused by her father, possibly with her mother's knowledge. [M] was dirty, ill and uncared for when taken into custody. The abuse and neglect of the older children placed the infant [D] in extreme risk of harm.

The Court believes these are young parents who have been overwhelmed by their rapidly expanding family and steadily diminishing resources. The mother has had a tremendously difficult load to bear as essentially the sole parent for the family because of the father's alcoholism. It appears that efforts are being made by the parents to remedy the life situations which lead to the dependencies of their children. The Court encourages their continued diligence in their efforts to reunite their family. They must recognize, however, the seriousness of these findings and the critical role they played in their children's difficult lives.

■ On appeal, the mother contends that the finding of dependency cannot be sustained because it was based entirely upon events occurring 18 months earlier with no evidence, other than that presented by the testimony of the parents, as to the present circumstances of the children and their parents. We disagree. Under A.R.S. § 8–201(11), a dependent child is defined as one adjudicated to be:

(a) In need of proper and effective parental care and control and has no parent or guardian, or one who has no parent or guardian willing to exercise or capable of exercising such care and control.

(b) Destitute or who is not provided with the necessities of life, or who is not provided with a home or suitable place of abode, or whose home is unfit for him by reason of abuse, neglect, cruelty or depravity by either of his parents, his guardian, or other person having his custody or care.

In their testimony, the parents effectively denied each and every allegation of the petition, insisting that they were not responsible for J's severe burns, that K had not been sexually abused by her father, that their home was not unhealthy and that their children had not been medically neglected. Assuming that sufficient evidence was presented to support those allegations, we will not hesitate to affirm a finding of dependency as to parents who presently deny that they are responsible for past abuse and neglect for the obvious reason that such denial of responsibility supports a finding that their children do not have parents presently willing to or capable of exercising proper and effective parental care and control. To hold otherwise would permit an abusive or neglectful parent to defeat an allegation of dependency by the mere passage of time.

■ For the same reason, we reject appellant's contention that the juvenile court erred in finding a dependency as to D, who was not born until after the events which initially gave rise to these proceedings. The statute quoted above permits a finding of dependency where a child's "home is unfit for him by reason of abuse, neglect, cruelty or depravity...." Assuming that the state can prove the conditions creating the dependency as to the older children, and that those conditions pose an imminent risk of harm to the newborn, the statute does not preclude the state from acting to protect the newborn until a specific injury has been inflicted upon him. Further, we find no merit to appellant's argument that

the statute is unconstitutionally vague and overbroad because "[i]t is unreasonable ... for a parent to anticipate that a future born child may be taken away from them because of conduct occurring before that child's birth." A parent may reasonably be expected to anticipate that a home found to be unfit as to one child will also be unfit as to others.

Appellant also attacks the finding of dependency on the ground that placement of the children with their paternal grandparents gave them "guardians" capable of providing for their care and control. The record does not reflect that the grandparents were appointed as the children's guardians in formal court proceedings, which we believe is contemplated by the statute. Rather, the children were placed with the grandparents while legal custody was awarded to DES.

Appellant next contends that the juvenile court erred in finding a dependency as to her because it "failed to determine definitively that the mother actually participated in any actions or omissions which made the children dependent." While it is true that the juvenile court did not make separate findings with respect to each parent, we do not believe this was necessary. Both parents were jointly found responsible for the physical conditions of the home and the medical, emotional and physical neglect of the children. While the juvenile court found that the father was responsible for the burns to J, the mother denied this and continued to blame K for his injuries. Finally, although the juvenile court found that K was sexually abused "possibly with the mother's knowledge," the mother continues to deny that the abuse occurred. A finding of dependency may be predicated on one parent's failure to prevent abuse by another parent. *Appeal in Pima County Juvenile Dependency Action No. 97247*, 158 Ariz. 55, 760 P.2d 1104 (1988). It follows that a finding of dependency is proper where that parent refuses even to acknowledge past abuse.

Several issues are raised with respect to the finding of sexual abuse. The mother claims that 1) the juvenile court erred in permitting Conaway–Morgan to testify as to K's statements to her; 2) Conaway–Morgan was not properly qualified as a medical expert and 3) the juvenile court erred in relying on the conclusions of Conaway–Morgan, which was the only evidence in support of the finding of sexual abuse.

The first two issues are answered by *State v. Robinson*, 153 Ariz. 191, 735 P.2d 801 (1987), and the statements in question were admissible under Ariz.R.Evid. 803(4), 17A A.R.S. Although Conaway–Morgan is a psychiatric social worker, rather than a psychologist as in *Robinson*, appellant has provided no basis for distinguishing the type of therapy provided by her from that provided by a psychologist and, consequently, no reason why that therapy should not be considered as treatment for "medical" purposes under Rule 803(4), as in *Robinson*. Further, as in *Robinson*, the record demonstrates Conaway–Morgan's reliance on and need for the information she obtained from K and that such information was "critical to effective diagnosis and treatment." 153 Ariz. at 199, 735 P.2d at 809. The fact that sexual abuse was not suspected in this case at the outset of therapy, in contrast to *Robinson*, does not undermine this conclusion. Conaway–Morgan testified that the child was initially fearful, guarded and reluctant to form trusting relationships with adults. She attributed the delay in reporting the molestation in part to the fact that she was wrongly blamed by her parents for injuring her brother. These factors, together with the spontaneous and unexpected nature of the report, if anything reinforce the reliability of the statements. We find no error in the admission of K's statements to Conaway–Morgan.

The third claim essentially argues that the juvenile court erred in relying on Conaway–Morgan's conclusion that the father had abused K in light of her admitted mistake in suspecting the parental grandfather of sexual abuse. We note initially that the error in question pertained not to the fact of abuse while K was in a foster home, but rather the identity of the perpetrator, that is, an individual in the foster home known to K as "Grandpa" rather than her natural grandfather who sometimes visited her in the foster home. Further, Conaway–Morgan testified that the report as to the fa-

ther was distinct and different in detail, and that K's repetitions of the report were always consistent with the original. The juvenile court did not err in relying on the therapist's testimony.

 Appellant's final claim is that the juvenile court's finding that the burns to J were caused by the father was contrary to the evidence. While it is true that Dr. Jones testified that it was "possible" for K to have lifted J into the bathroom sink and turned the hot water on, he later testified that that possibility did not change his opinion that the burns were not caused by K. Further, appellant's theory was inconsistent with her testimony that she awoke to find K in the hallway holding J, because there was no evidence of any burns on K's hands, which would necessarily have resulted from removing J from a sink full of scalding water. Additionally, this theory was inconsistent with the nature of the burns, which Dr. Jones testified were not the result of immersion in water. There was substantial evidence in support of the juvenile court's finding on this issue.

The order of the juvenile court adjudicating the minors dependent is affirmed.

FERNANDEZ, C.J., LIVERMORE, P.J., and LACAGNINA, J., concur.