NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO G.A. and G.A.

No. 1 CA-JV 23-0201

FILED 05-20-2025

Appeal from the Superior Court in Maricopa County
No. JD533002
The Honorable Ronee Korbin Steiner, Judge
The Honorable Cassie Bray Woo, Judge

**AFFIRMED**

COUNSEL

David Bell Attorney at Law, Higley
By David W. Bell
*Counsel for Appellant Mother*

Arizona Attorney General's Office, Tucson
By Autumn Spritzer
*Counsel for Appellee Arizona Department of Child Safety*

---

**MEMORANDUM DECISION**

Presiding Judge Michael J. Brown delivered the decision of the Court, in which Judge D. Steven Williams and Judge Daniel J. Kiley joined.

---

**B R O W N**, Judge:

¶1        Gabriela Z. ("Mother") appeals from the juvenile court's order terminating her parental rights to her two children, G.A. and G.E.A. Because Mother has not shown the court clearly erred, we affirm.

## BACKGROUND

¶2        Mother and Luis A. ("Father") have two children together, G.A. and G.E.A., born in 2015 and 2019 respectively.[1]  In October 2019, the Department of Child Safety ("DCS") received a report about a domestic violence incident in which Mother, who was "extremely intoxicated," assaulted Father.  DCS petitioned for dependency, alleging Mother was unable to parent due to domestic violence, neglect, and substance abuse. The children were removed from the home, and within a few months Mother and Father completed domestic violence counseling through TERROS.  Mother also completed anger management classes and remained sober for several months after DCS filed the dependency petition.  The children were returned to the parents' care and the juvenile court granted DCS's motion to dismiss the dependency petition.

¶3        Less than a month later, police were called to the family's apartment in response to complaints of loud music and screaming children. Officers noted that Mother behaved erratically and was verbally aggressive toward her neighbor and the apartment manager.  During Mother's conversation with police, four-year-old G.A. came to the door with an open beer bottle.  Mother later tested positive for methamphetamine ("meth"), and DCS again petitioned for dependency, alleging Mother was unable to parent due to substance abuse, neglect, and mental health issues.

¶4        DCS provided Mother various reunification services, including substance abuse treatment, supervised visitation, and counseling.  In September 2020, Dr. Menendez (a psychologist) diagnosed

---

[1]        The juvenile court also terminated Father's parental rights, but he is not a party to this appeal.

Mother with several conditions, including substance abuse disorder, post-traumatic stress disorder, and borderline personality disorder.[2] The psychological evaluation "revealed an irritable, impulsive, irresponsible individual whose behaviors are difficult to predict." Mother's personality disorder, Dr. Menendez opined, causes behavior that leads to recurrent encounters with law enforcement and DCS. Dr. Menendez concluded "[t]he prognosis that [Mother] will be able to safely parent her children in the foreseeable future is poor," and that she had "little insight into the reasons for her DCS involvement." However, over the next 18 months both parents engaged in services and eventually were reunified with the children. In January 2022, the juvenile court dismissed the dependency at DCS's request.

¶5        In May 2022, police went to the family's home in response to a domestic violence call. Father said that Mother had damaged the air conditioning units in the home, and he believed she was under the influence of drugs. Mother had also been lighting dollar bills on fire and then placed them on the carpet and on piles of clothing. Police entered the home and found Mother had locked herself in a back room with the children, who were crying. The officers removed Mother from the room and found a small amount of "crystal like substance" that appeared to be meth. This incident prompted DCS to file another dependency petition, noting Mother's long history of substance abuse dating back to 2006, and alleging she was unwilling or unable to properly care for the children by neglecting them "due to her substance abuse, unaddressed mental illness, and domestic violence."

¶6        Mother pled guilty to attempted arson based on what occurred in May, and in August 2022 she was sentenced to a three-year term of supervised probation, which included a condition to serve nine months in jail. In October, DCS moved to terminate Mother's parental rights based on three statutory grounds: mental illness, substance abuse, and recurrent dependency. See A.R.S. § 8-533(B)(3), (11). DCS later amended the motion to include a fourth ground—15 months in an out-of-home placement. See A.R.S. § 8-533(B)(8)(c).

¶7        While in jail Mother completed several classes covering parenting, substance abuse, and mental health. During this time, Mother

---

[2]        Dr. Menendez explained that borderline personality disorder is "characterized by a general instability, unpredictability in behavior, changes in mood and affect, impulsivity," and a "general instability of functioning."

was supposed to have video visitation with her children. Though visits were set up by June 2022, the visits stopped in August when a supervised visitation agency was scheduled to take over handling of the visits from a DCS case aide, but the jail did not work with the agency, leading to closure of the referral. After several attempts to work with the jail were unsuccessful, DCS assigned a case aide who the jail would work with in December and visits with G.E.A. resumed. G.A., however, refused to participate in visits.

¶8　　　　Mother was released from jail in February 2023 and immediately enrolled in the Arizona Women's Recovery Center ("AWRC"). While in AWRC Mother participated in many programs and services including drug testing through PSI, parenting classes, substance abuse classes, counseling, narcotics anonymous, and alcoholics anonymous. Despite finding her time there helpful, Mother abruptly left the program in the summer of 2023. Mother claimed she left the program "because it was [] very intense," she was "very independent," and the staff were impeding her recovery. But records from her probation officer indicate that shortly before leaving Mother had "multiple outbursts in front of other women and staff." She also informed the probation officer she left AWRC because the staff were more attentive toward new women entering the program and she felt the staff had "moved her towards the bottom." After leaving AWRC, Mother secured an apartment and employment.

¶9　　　　Dr. Menendez met with Mother several times in 2023 and conducted a re-evaluation, which revealed that despite Mother's progress in achieving sobriety, she failed to take responsibility for her prior actions. Dr. Menendez explained that Mother "offered no verbal apology for the fear and maltreatment experienced by her children, nor did she exhibit any remorse" for her actions, and instead "externalized blame." After these sessions, Dr. Menendez concluded that Mother "continues to behave in an impulsive manner" and despite her sobriety, she "continues to manifest personality characteristics which may lead to future social/emotional difficulties." As in her initial evaluation, Dr. Menendez determined that the "prognosis that [Mother] can reunify with her children in the immediate future is poor."

¶10　　　　In August 2023, DCS investigated allegations that the foster parents had physically abused G.E.A. Assertions of abuse were unsubstantiated, and the DCS investigator noted that the family seemed bonded and was interacting appropriately. Through the investigation, however, DCS obtained "collateral information surrounding ongoing concern[s] with the foster parents discouraging the children from attending

4

visits." Specifically, DCS found that on at least one occasion, the foster parents scheduled therapy for the children at the same time as scheduled visits. DCS discovered the foster parents had been punishing the children for attending parental visits and rewarding them for refusing to attend. The foster parents had also spoken negatively of the biological parents and had refused to refer to the children by their birth names. Two weeks after the investigator determined the abuse allegations were unsubstantiated, DCS sent the foster parents a letter of violation noting the various infractions of administrative rules and requiring additional training and cooperation. The juvenile court later found that the foster parents complied with DCS's compliance measures.

¶11 The court held a contested termination hearing over four days. During her testimony, Mother denied many events surrounding the May 2022 incident that led to the third dependency petition. She admitted only to burning a $20 bill; she denied damaging any air conditioner unit, trying to start any fire, acting combatively with police officers, or possessing any meth.

¶12 Dr. Menendez also testified, acknowledging Mother's time in AWRC but doubting that Mother could demonstrate insight into the reasons for DCS's involvement. During their sessions, Mother would not respond to questions about how her prior actions may have made her children feel, and she resisted discussing the actions leading up to the third dependency petition as well as a separate severance of parental rights in California that occurred before the births of G.A. and G.E.A. Dr. Menendez also noted that the type of counseling used to help treat borderline personality disorder requires exploring past traumas and a willingness on the patient's part to engage with that past. She ultimately concluded that Mother did not have the ability to safely parent and that to do so would require her to acknowledge "how her behavior affects other people" as well as "understanding [] and taking responsibility for past interruptions in parenting."

¶13 In its detailed termination ruling, the court first addressed the services both parents received. As to Mother, the court noted the psychological evaluations, individual counseling, domestic violence counseling, substance abuse treatment, drug testing through PSI, and supervised visitation. The court acknowledged the foster parents' behavior and DCS's inaction "caused some interference" with visitation. Despite these issues, the court found that DCS made reasonable and diligent efforts "to effectuate reunification of the family."

**¶14**        The court also found that DCS had proven each of the four statutory grounds for termination by clear and convincing evidence. Addressing the 15 months' out-of-home placement ground under A.R.S. § 8-533(B)(8)(c), the court acknowledged that Mother had engaged in services but found that she (1) "does not appear to have made any real significant strides," and (2) fails to "understand[] the nature of her behavior and how it can harm the children."  The court also reasoned that despite participating in services and remaining sober, Mother "ha[d] done the same in the past, only to relapse."  Accordingly, the court determined there was a substantial likelihood Mother would not be capable of exercising proper and effective parental care and control in the near future.  The court also found termination was in the children's best interests.  Mother timely appealed in October 2023.  We have jurisdiction under A.R.S. § 8-235(A).

**¶15**        In March 2024, this court ordered a stay of this appeal under Administrative Order 2024-08 due to disclosure issues relating to processing errors in DCS's Guardian portal for service providers.  Ariz. Ct. App., Div. 1, Admin. Order No. 2024-08.  DCS thereafter disclosed several documents, and Mother moved to set aside the termination order.  The juvenile court denied Mother's motion, finding that none of the portal documents could have affected the trial result because they had all been either disclosed before trial or created after the trial had ended and thus were not appropriate for consideration at trial.  Mother filed a supplement to her opening brief, conceding the untimely disclosure "was not sufficiently persuasive alone to impact" the court's original trial result.  Also, while this appeal was stayed, the juvenile court appointed new counsel to review additional documents that were not timely disclosed due to the Guardian issues.  After allowing Mother's counsel sufficient time to review those documents, the court determined the case was ready to be returned to this court, and the stay of Mother's appeal was lifted.

## DISCUSSION

**¶16**        Mother challenges the juvenile court's termination on three grounds: (1) DCS failed to provide sufficient, diligent reunification efforts; (2) the court erred in terminating her rights on all four statutory grounds and (3) the court abused its discretion in finding that termination was in the children's best interests.

**¶17**        In reviewing an order terminating parental rights, we defer to the juvenile court's findings of fact and will accept them if supported by reasonable evidence or inferences. *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478, ¶ 30 (2023).  We will affirm the juvenile court's legal

conclusions on the statutory grounds for termination, which must be proved by clear and convincing evidence, unless they are "clearly erroneous." *Id.* at 478–79, ¶ 31. We view the facts in a light most favorable to sustaining the court's findings. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 2, ¶ 2 (2016). To terminate parental rights, a court must find (1) by clear and convincing evidence that at least one statutory ground in A.R.S. § 8-533(B) has been proven, and (2) by a preponderance of the evidence that termination is in the child's best interests. *See Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 286, ¶ 15 (App. 2016).

## A.     Fifteen Months' Out-of-Home Placement

**¶18**        To terminate Mother's parental rights based on 15 months' in an out-of-home placement, DCS had to prove: (1) the children were in an out-of-home placement for a cumulative total period of 15 months or longer under a court order, (2) Mother had been unable to remedy the circumstances that caused the children to be in an out-of-home placement, and (3) there is a substantial likelihood that Mother will not be capable of exercising proper and effective parental care and control in the near future. A.R.S. § 8-533(B)(8)(c). Mother challenges only the third prong of the statute, pointing to her extended sobriety and the fact that she had secured housing and employment.

**¶19**        Even though Mother showed progress in sobriety and her other achievements, reasonable evidence supports the court's determination. The court found that "[d]espite being previously reunified with the children, [Mother] continued to violate the law" and that "[a]s soon as DCS is out of the picture, Mother regresses." As to substance abuse, though Mother abstained from drug use after serving her jail sentence, the court determined that "abstention from use of substances and testing negatively alone does not show sobriety." Instead, the court explained that sobriety "is a process that requires an understanding, addressing the causes, and the treatment of underlying causes for substance use," and that Mother had failed to "acknowledge[] the extent of her substance abuse and the harm it causes." Addressing mental illness, the court found that Mother "minimized the extent of her diagnoses" and that she "does not truly accept that she needs significant [] therapy." This was concerning because Mother's "behaviors and choices limit her ability to provide the children with a safe and stable home," meaning she would not be able to appropriately care for her children. The court explained that "Mother has not demonstrated a commitment to addressing her underlying mental health diagnoses or trauma" as she would need to maintain long-term stability.

**¶20**        As the court found, Mother has a history spanning several years in which she shows sufficient improvement to reunify with her children, only to engage in behaviors that put the children in dangerous situations soon after.  Through this time, Mother has not shown an understanding that her underlying mental health concerns and behaviors have caused her children to be placed in unsafe circumstances.  As noted by Dr. Menendez, Mother has not taken responsibility for her actions which occurred in May 2022; even at trial, Mother largely denied committing any of the acts detailed by police.  Mother further testified she was surprised to learn that her daughter (age six at the time) was frightened by these same actions.

**¶21**        Mother has also consistently denied having borderline personality disorder, which Dr. Menendez concluded caused her behavior that leads to recurrent interventions by DCS and law enforcement.  And despite several years of services, the two psychological evaluations of Mother revealed that she still behaved impulsively and had a poor prognosis for being able to effectively parent her children.  Mother's failure to acknowledge her behaviors that led to the most recent dependency, much less the cause of such behaviors, supports the conclusion that she cannot exercise the care and control required under the statute.  *See Pima Cnty. Juv. Dependency Action No. 96290,* 162 Ariz. 601, 604, (App. 1990) (noting that courts will "not hesitate to affirm" a finding that parents cannot exercise proper and effective parental care and control if the parents "deny that they are responsible for past abuse and neglect").

**¶22**        The juvenile court did not ignore Mother's sobriety.  Her efforts to secure housing and employment after her incarceration are commendable, but as the court explained, she has repeatedly engaged in reunification services, only to engage in recurring behavior that places the children in danger.  The extent to which evidence of Mother's sobriety and progress in other areas of her life cuts against evidence of her inability to take responsibility for or understand her past actions is solely within the juvenile court's discretion.  *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶¶ 11–12 (App. 2002) (explaining that the resolution of conflicting evidence "is uniquely the province of the juvenile court as the trier of fact").  And though Mother's evidence indicated she was doing well at the time of the termination hearing, § 8-533(B)(8)(c) required the court to consider whether a substantial likelihood existed that Mother would not be "capable of exercising proper and effective parental care and control in the near future."  Considering Mother's history of improving and then regressing soon after such improvement, the juvenile court had reasonable evidence from which to conclude that Mother's recent progress was insufficient to

overcome the lack of insight regarding the underlying causes of her behavior. Thus, the court's determination that it was substantially likely Mother could not exercise effective parental care and control in the near future is not clearly erroneous.

## B. Reunification Services

**¶23** DCS was also required to prove it made diligent efforts to provide appropriate reunification services to Mother. *See* A.R.S. § 8-533(B)(8), (D) ("[T]he court shall consider the availability of reunification services to the parent and [their] participation . . . in these services."). DCS must provide services and give the parent an opportunity to engage in the services, *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 37 (App. 1999), but it is not required to wait an indefinite period before requesting termination of parental rights, *Maricopa Cnty. Juv. Action No. JS-501568*, 177 Ariz. 571, 577 (App. 1994). DCS has no obligation to provide services that would be futile or ensure parents participate in the services offered, but it must give them the time and opportunity to participate in programs designed to help parents effectively parent. *Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 235, ¶¶ 14–15 (App. 2011) (citation omitted).

**¶24** Mother argues there are two errors in the juvenile court's determination that DCS diligently provided Mother with appropriate reunification services. She contends (1) DCS failed to avoid certain delays and gaps in supervised visits, and (2) the foster parents' actions effectively sabotaged her ability to reunify with the children.

**¶25** The record shows there were times when DCS encountered challenges in providing Mother with supervised visits. The first occurred while Mother was in jail and the jail refused to work with the visitation agency. The second interruption occurred a month before trial, when a DCS case aide had to cancel a couple of visits because of a holiday and case aide illness. Despite Mother's assertion on appeal that these delays were "simply unacceptable," nothing in the record establishes DCS acted unreasonably under the circumstances. While DCS must "initiate measures designed to address an incarcerated parent's desire to maintain a parent-child relationship," *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 582, ¶ 21 (2021), DCS did make efforts to facilitate visits while Mother was in jail, and after visits stopped in August, DCS worked with the jail to resume visits by that December. By July 2023, DCS was providing make up visits for the times Mother could not have visits in jail. Though two of those visits were missed because of illness and a holiday, Mother has not shown how DCS

acted unreasonably under these circumstances. *See Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 23, ¶ 50 (App. 2019) (noting that "diligent effort" requires DCS to "make reasonable efforts to assist the parent in areas where compliance proves difficult"); *see also Kyle R. v. Dep't of Child Safety*, No. 1 CA-JV 22-0048, 2022 WL 6612638, *4, ¶¶23–24 (Ariz. App. Oct. 11, 2022) (mem. decision) (finding that a six-month gap in visitation did not constitute a failure to provide a parent with visitation services).

**¶26** Mother also argues the court erred in finding that DCS provided her with diligent services because it failed to timely address the foster parents' interference with visits. But Mother does not direct us to any evidence showing that DCS knew of the foster parents' behavior until it began its investigation into the separate report of abuse. The record suggests that DCS learned about the issues with the foster parents' actions during an investigation into unrelated abuse allegations. The subsequent report addressing the investigation was dated July 25, 2023. On August 9, DCS found the allegations were unsubstantiated, but noted that "throughout the course of the investigation [DCS] reviewed and obtained collateral information surrounding ongoing concern with the foster parents discouraging the children from attending visits."[3] On August 24 DCS sent a letter of violation detailing the unacceptable conduct and outlining the required corrective actions. The court found that DCS followed up with the family to ensure compliance, and that the foster parents had completed tasks DCS instructed them to complete in its letter of violation.

**¶27** As the juvenile court recognized, the foster parents' behavior was inappropriate. At the conclusion of the termination hearing, the juvenile court noted concerns about the foster parents' actions as described in DCS's letter of violation, stating it was "very troubled by the information." Even so, while recognizing the foster parents' actions "caused some interference" with providing visitation, the court also found that the "Department made reasonable and adequate efforts to provide Mother with the necessary services to reunify with the [c]hildren."

**¶28** Moreover, as the juvenile court described, the record does not indicate that the foster parents' actions were the primary obstacle between

---

[3] The record does not show when the foster parents began engaging in this behavior. Because we view the facts in a light most favorable to sustaining the court's order, *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009), we will not assume the foster parents engaged in this behavior throughout the entire dependency, or in any of the prior dependencies involving G.A. and G.E.A.

Mother and the children. Although G.A. refused to attend visits from December 2022 through late summer of 2023, the record (including DCS reports and G.A.'s own therapy records) suggests her refusal was motivated in part by her own apprehension regarding Mother's past conduct. When DCS personnel asked G.A. about her refusal to attend, she said she was afraid of Mother due to her past actions, including the incident giving rise to the third dependency as well as Mother's violence toward Father. And despite G.A.'s hesitancy to go on visits, G.E.A. participated in visits more often.

¶29        The juvenile court considered the totality of the circumstances in deciding DCS provided diligent services, *Donald W.*, 247 Ariz. at 23, ¶ 49, and we will not reweigh that evidence on appeal, *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 151, ¶ 18 (2018). Though Mother urges us to deviate from this standard because the foster parents' behavior was "so egregious," the principle applies even when facts are "sharply disputed." *Id.* (citation omitted). Mother has not shown error in the court's findings on services.

### C.        Best Interests

¶30        Mother also challenges the juvenile court's conclusion that termination was in the children's best interests. Termination of parental rights is in a child's best interests if either the child will benefit from termination or be harmed if it is denied. *Alma S.*, 245 Ariz. at 150, ¶ 13. In deciding whether termination is in a child's best interests, courts "must consider the totality of the circumstances existing at the time" the termination decision is made. *Id.* at 150–51, ¶ 13.

¶31        Mother contends the court failed to properly consider the totality of the circumstances in finding that termination would be in the children's best interests. The court found that the children were adoptable, and the foster parents were bonded with the children and meeting their needs. Despite the issues that occurred with the foster parents, the court noted that they had been with the children throughout the earlier dependencies, so much so that DCS considered the foster parents a kinship placement. The court also found that continuing the relationship with Mother would harm the children based on her failure to address the underlying issues that caused her to abuse substances and engage in domestic violence, and that if Mother's rights were not terminated, the children would "face a serious likelihood of further trauma by [another] removal."

¶**32**      Mother argues the court improperly determined that termination was in the children's best interests because the court relied, in part, on the "children's expressed desire to be adopted by the foster [parents]." She contends these wishes were corrupted by the foster parents' actions, and the court failed "to give proper weight" to this component of the case. But as we have noted, we will not reweigh evidence the juvenile court considered. *Alma S.*, 245 Ariz. at 151, ¶ 18. Even assuming the foster parents' actions made it inappropriate for the court to rely on the children's wishes, the court had other factors it could, and did, rely on to find that termination was in the children's best interests. Because the court's determination that continuing the parent-child relationship would harm the children is supported by the record, Mother has not shown that the court erred.

## CONCLUSION

¶**33**      We affirm.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:            JR